Ranfos v. SSA                    CV-00-589-B    01/24/02

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


Judith A. Ranfos

    v.                                    Civil No. 00-589-B
                                        Opinion No. 2002 DNH 021

Larry G. Massanari, Acting
Commissioner, Social Security
Administration


MEMORANDUM AND ORDER


Judith Ranfos applied for Title XVI Supplemental Security benefits in January 1997.  Ranfos alleged an inability to work since September 23, 1995, due to problems with her left foot and lower back.  The Social Security Administration ("SSA") denied her application initially and on reconsideration.  Administrative Law Judge ("ALJ") Ruth L. Kleinfeld held a hearing on Ranfos' claim on January 8, 1998.  In a decision dated February 24, 1998, the ALJ found that Ranfos was not disabled.  On December 15, 2000, the Appeals Council denied Ranfos' request for review of the hearing decision, rendering the ALJ's decision the final decision of the Commissioner of the SSA.

Ranfos brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the denial of her application for benefits. Ranfos requests that I reverse the Commissioner's decision and award her benefits. For the reasons set forth below, I conclude that the ALJ's decision is supported by substantial evidence. Therefore, I affirm the Commissioner's decision and deny Ranfos' motion to reverse.

## I. FACTS[1]

Ranfos was forty-six years old when she applied for benefits. She has a tenth grade education, and has worked as a restaurant owner, manager, waitress, cook, dishwasher and cashier. Tr.[2] at 42-44, 64-65, 131-33. Ranfos has not worked since taking medical leave from her most recent job on September 23, 1995, and asserts that she cannot now work because of pain associated with her disability. Tr. at 106, 205, 251.

---

[1] Unless otherwise noted, I take the following facts from the Joint Statement of Material Facts submitted by the parties.

[2] "Tr." refers to the certified transcript of the record submitted to the Court by the SSA in connection with this case.

Ranfos suffered a slip and fall at a grocery store on September 12, 1995. Dr. A. Langlois saw Ranfos the next day and diagnosed a sprained ankle. The doctor applied an ace bandage, and recommended Advil, heat and rest. Tr. at 205, 215, 217.

Approximately one week later, Ranfos saw a podiatrist, Dr. Raef Fahmy, who x-rayed Ranfos' left foot and found a fracture of her left navicular cuneiform joint. Tr. at 251. Dr. Fahmy put the foot in a cast, which was later removed on November 6, 1995. Tr. at 251. Ranfos reported an improvement in her foot in December 1995, although she still needed the assistance of crutches. Tr. at 251-52. On January 18, 1996, Ranfos visited Dr. Fahmy and reported only a slight improvement since the last visit, and complained of burning and numbness in her leg and foot, as well as pain radiating from her lower back down her buttocks. Dr. Fahmy recommended more physical therapy and that Ranfos be evaluated for sciatica. Tr. at 252.

Ranfos saw an orthopedic specialist, Dr. James C. Vailas, on February 2, 1996. Tr. at 277. An MRI scan showed lateral disc herniation, a small but not complete rupture of the disc, and no obvious encroachment on the neural elements. Tr. at 221, 277-78. During a subsequent visit, on April 19, 1996, Dr. Vailas observed

-3-

that Ranfos was not improving, despite her nine physical therapy visits. Tr. at 278.

Ranfos next saw another orthopedic specialist, Dr. Tom Kleeman, on May 2, 1996. Dr. Kleeman observed that Ranfos appeared extremely deconditioned and stiff, despite having had physical therapy, and that she walked with a very stiff antalgic gait, favoring her left foot. He noted that she had "give way" weakness on her left leg. Tr. at 280. Dr. Kleeman did not think surgery was necessary, and recommended aggressive physical therapy.

Shortly thereafter, Dr. Burton Nault, a non-examining physician, reviewed Ranfos' medical records and prepared a residual functional capacity ("RFC") assessment for the state disability determination service. Tr. at 77, 283-91. He found that Ranfos suffered from significant impairments due to a possible soft tissue Lisfranc's injury to the left foot, as well as evidence of a small herniated disc at L4-5. Tr. at 289. Despite a lack of supporting clinical evidence, Dr. Nault also noted subjective radiculopathy, a disorder of the spinal nerve roots. Tr. at 289. Based on these impairments, Dr. Nault opined that Ranfos was capable of lifting twenty pounds occasionally and

ten pounds frequently, standing or walking for two hours and sitting for six hours in an eight-hour workday, without push or pull limitations. Tr. at 284. According to Dr. Nault, Ranfos had postural limitations in that she could climb, balance, stoop, kneel, crouch and crawl less than one-third of the time. Tr. at 285. Dr. Nault concluded that Ranfos could perform sedentary work. Tr. at 289.

Ranfos returned to Dr. Kleeman on June 3, 1996, and reported that her condition had significantly improved due to her use of exercise equipment in physical therapy. Tr. at 282. Because Ranfos' formal physical therapy was coming to an end, Dr. Kleeman advised her to continue exercising at home. Tr. at 282. Dr. Kleeman also spoke with Ranfos about the possibility of returning to work, and opined that it would be an excellent way for her to return to the mainstream. Tr. at 282.

On February 20, 1997, Dr. William Kilgus examined Ranfos on behalf of the state disability determination service. Tr. at 293-94. He observed that Ranfos walked with a slight antalgic gait, but did not list to either side when standing. His examination of her left foot revealed a limited range of motion in flexion, and he noted that she experienced mild pain on

extremes of motion. Tr. at 294. Dr. Kilgus identified no neurovascular deficit, and observed no areas of swelling or discoloration. He concluded that Ranfos' overall prognosis was good, and that she had full-time work capacity, ideally in a setting that required only sedentary activity and working with her upper extremities. Tr. at 294.

The state disability determination service completed an RFC assessment on March 2, 1997, which indicated an improvement over the exertional limitations reported previously by Dr. Nault. Tr. at 296-303. It stated that Ranfos could stand or walk for six hours out of an eight-hour workday. Tr. at 297. Dr. Robert C. Rainie ratified this RFC assessment on June 27, 1997, and noted that Ranfos was capable of light work. Tr. at 296.

On March 19, 1997, Ranfos sought help from a chronic pain specialist at the Elliot Hospital Pain Clinic for her leg and foot pain. Tr. at 224. Dr. Ronald C. Kennedy examined Ranfos and found decreased sensitivity to light touch and decreased strength in her left leg from the knee down. Tr. at 224. Dr. Kennedy further observed: pain in the back with rotary movements of the left lower extremity; straight leg raises on the left caused discomfort in the back and up the leg with 70 to 80

degrees and accentuated with dorsiflexion; palpation of the back revealed left sacroiliac joint pain, but no pain on the right. Tr. at 224. Dr. Kennedy opined that Ranfos had probable reflex sympathetic dystrophy ("RSD") secondary to her fracture injury sustained in September of 1995; she also had left sacroiliac joint strain, secondary to abnormal gait. Dr. Kennedy opined that Ranfos had possible lumbar radiculopathy, but that the RSD was the most likely problem at that time. Tr. at 224. He discussed with Ranfos the possibility of doing a lumbar sympathetic block as a diagnostic and therapeutic procedure, and that her sacroiliac joint discomfort might be alleviated with sacroiliac joint block. Tr. at 224-25.

Approximately three weeks later, Ranfos underwent a lumbar sympathetic block for evaluation of her left foot pain. Tr. at 228. The procedure resulted in a significant decrease of pain, although the pain returned the next morning. Tr. at 228, 233. On April 14, 1997, Ranfos underwent another procedure, this time involving placement of a lumbar epidural catheter which dosed over two days, resulting in a reduction of pain. Tr. at 232-43. However, Ranfos experienced some difficulty walking. Tr. at 234.

Dr. Stephen Dainesi, an anesthesiologist, saw Ranfos on April 16, 1997, her third consecutive day of treatment. Ranfos stated that she was experiencing a reduction in her pain. Dr. Dainesi felt that if Ranfos' pain persisted, it would indicate a complex regional pain syndrome. Tr. at 241. Nursing notes indicated that Ranfos stood and walked with difficulty. Tr. at 242. On April 22, 1997, Ranfos reported to Dr. Dainesi that she was doing significantly better overall, and that her pain usually recurred only when she walked for awhile. Tr. at 245. Dr. Dainesi renewed Ranfos' prescription for Neurontin,[3] and confirmed that Ranfos' left foot pain symptoms were consistent with complex regional pain syndrome Type I. Tr. at 245.

When Ranfos again saw Dr. Dainesi on May 9, 1997, he noted that she had done well with the block, which caused her to be pain free for the first week. He decided to wean Ranfos from Neurontin and start her on Mexiletine,[4] which he thought would be

---

[3] Neurontin is adjunctive therapy in the treatment of partial seizures with or without secondary generalization in adults with epilepsy. Physicians' Desk Reference 2110 (52d ed. 1998).

[4] Mexiletine hydrocholride is a local anesthetic. Physicians' Desk Reference 720 (52d ed. 1998).

more effective for her pain.  He prescribed 150 mg, three times per day.  Tr. at 247.

Dr. Dainesi increased Ranfos' daily dosage of Mexiletine to 200 mg, three times per day, on August 20, 1997, in response to her reported increase in foot pain after doing a lot of walking. Tr. at 250.  The next day, Dr. Dainesi completed a physical capacities evaluation form, in which he opined that she could occasionally lift ten pounds, could stand/walk for less than fifteen minutes at a time, that her ability to concentrate was limited by her pain, that she could not climb, crouch, kneel or crawl, and that she could balance and stoop only occasionally. Tr. at 306-08, 310.

At her January 8, 1998 hearing for Social Security benefits, Ranfos testified about her condition.  She explained that walking exacerbates her pain, and that she is pain free only when sitting with her leg elevated.  Tr. at 47, 48.  Ranfos stated that she can sit for only twenty minutes at a time, and that sleeping is uncomfortable because her leg often goes numb.  Tr. at 50, 51, 57.  When walking, Ranfos prefers to use a cane instead of the crutches that she was prescribed.  Tr. at 51.  Ranfos testified that when standing, she is more comfortable when she has

-9-

something to lean on, and when sitting, she needs to elevate her leg most of the time.  Tr. at 51, 62.  Walking distances of more than 150 yards causes her pain, as does walking up or down stairs.  Tr. at 53, 56.  Ranfos testified that she has trouble with some daily activities such as getting in and out of the shower, getting in and out of a car, and bending over to reach items.  Tr. at 50, 52-53.

Ranfos updated the ALJ concerning her medication.  She stated that she takes 1000 mg. of Mexiletine per day, which relieves her pain and produces no side effects other than fatigue.  Tr. at 54-55.  Ranfos testified, however, that the medication is not always effective and that when she is on her leg, the pain often returns.  On the day of the hearing, Ranfos stated that her pain measured about an eight, on a ten point scale, even though she took her medication that morning.  Tr. at 56-57.  Ranfos also testified that both pain and numbness in her leg wakes her up at night, and that when her leg is numb, trying to restore circulation causes pain.  Tr. at 57.

Christine Spaulding, a vocational expert ("VE"), testified at the hearing after Ranfos.  She stated that Ranfos' past work experience included both light and medium exertional range

positions that were skilled, semi-skilled and unskilled, and, assuming an RFC for only sedentary work, all of her past work experience would be precluded. Tr. at 64-65. Spaulding then assumed Ranfos would have a sedentary RFC with a sit/stand option, no climbing, no unprotected heights, and the opportunity to elevate her leg. Spaulding concluded that sufficient work exists in the national and local economies that would accommodate Ranfos' limitations. Tr. at 65-67. Examples of jobs included cashier positions, office clerk, administrative support, receptionist, information clerk, security guard, gate guard, surveillance system monitor, various manufacturing positions, inspector positions, packer, machine operator, and photo processing machine operator. These positions account for approximately 2,700 jobs locally, and 533,000 jobs nationally. Tr. at 66-67.

Spaulding then opined that if Ranfos also needed to be able to walk away from her work station every fifteen minutes, it would eliminate the entire job base. Tr. at 68-69. Additionally, Spaulding noted that factoring in a moderate degree of fatigue and lack of concentration would impact a person's ability to do the jobs she had identified. Tr. at 70-71.

After the hearing, the ALJ applied the five-step evaluation process established by the SSA.[5]  At step one, she found that Ranfos had not engaged in substantial gainful activity since September 23, 1995.  Tr. at 34.  At step two, the ALJ found that Ranfos had "a soft tissue injury to the left lower extremity and degenerative disc disease of the lumbar spine."  Tr. at 34.  At step three, she found that Ranfos' impairments did not meet or equal the criteria of any listed impairment described in 20 C.F.R. § 404.  Tr. at 34.  Next, the ALJ assessed Ranfos' RFC and found that she could not lift and carry more than ten pounds, sit for prolonged periods of time without standing as needed, climb stairs or ladders or work at unprotected heights.  Tr. at 35. The ALJ found at step four that these limitations precluded Ranfos from returning to her former employment.  Tr. at 35. Finally, the ALJ found at Step 5 that Ranfos was not disabled because she could perform work which exists in significant numbers in the national economy.

Ranfos appealed the ALJ's decision to the Appeals Council and produced the following new medical evidence.  On October 12,

_____

[5]     See infra note 6.

-12-

1998, Ranfos underwent the placement of an epidural catheter and dosing over three consecutive days. Tr. at 337. On October 13, 1998, Dr. Kennedy noted that Ranfos was experiencing no pain in her left foot. Tr. at 338. On November 18, 1998, Dr. Wesley Wasdyke observed that Ranfos' pain had been at a manageable level, but she had not been doing much, and mainly stayed at home because the cold and rainy weather was difficult for her. Tr. at 320.

On January 29, 1999, Ranfos saw Dr. Wasdyke and reported that she had less pain when she did not use her foot, stand or walk too much. Dr. Wasdyke discussed with Ranfos different possible treatments for her complex regional pain syndrome. Tr. at 319.

On March 23, 1999, Ranfos saw Dr. David Mevorach for placement of another epidural catheter, with three days of dosing. Tr. at 317. According to Ranfos, the procedure usually resulted in two months of pain relief. On August 11, 1999, Ranfos saw Dr. Dainesi, who noted that she had seen Dr. Razvi for another epidural catheter. Tr. at 358. Ranfos reported that her foot felt somewhat better after the re-dose. Tr. at 358.

Dr. Dainesi referred Ranfos to Dr. Lawrence Hoepp, a vascular surgeon, whom she saw on September 20, 1999, to consider a "lumbar sympethectomy," which would provide longer term relief for her RSD. The procedure, involving a surgical cutting of the nerve, would not relieve her muscular dystrophic problems, and would require extensive physical therapy after the surgery. Dr. Hoepp could not guarantee Ranfos the procedure would provide total relief from her pain. Tr. at 357.

## II. STANDARD OF REVIEW

After a final determination by the Commissioner denying a claimant's application for benefits, and upon timely request by the claimant, I am authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the ALJ's decision. See 42 U.S.C. § 405(g). My review is limited in scope, however, as the ALJ's factual findings are conclusive if they are supported by substantial evidence. See id.; Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam). The ALJ is responsible for settling credibility issues, drawing inferences from the

-14-

record evidence, and resolving conflicts in the evidence.  See Irlanda Ortiz, 955 F.2d at 769.  Therefore, I must "uphold the [ALJ's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the ALJ's] conclusion."  Id. (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation marks omitted).

The ALJ's findings of fact are unalterable unless they are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).  I apply this standard in reviewing the issues that Ranfos raises on appeal.

## III. DISCUSSION

The Social Security Act (the "Act") defines "disability" for purposes of Title XVI as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Act directs an ALJ to apply a five-step

sequential analysis to determine whether a claimant is disabled.[6] See 20 C.F.R. § 404.1520.  At step four, the ALJ must determine whether the claimant's impairment prevents her from performing her past work.  See id. § 404.1520(e).  To make this determination, the ALJ must assess both the claimant's residual functional capacity ("RFC"), that is, what the claimant can do despite her impairments, and the demands of the claimant's prior employment.  See id.; 20 C.F.R. § 404.1545(a); see also Santiago v. Sec'y of Health & Human Servs., 944 F.2d 1, 7 (1st Cir. 1991) (per curiam).  The claimant, however, bears the burden of showing that she does not have the RFC to perform her past relevant work. See Santiago, 944 F.2d at 5.

At step five, the burden shifts to the Commissioner to show "that there are jobs in the national economy that [the] claimant can perform." Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991) (per curiam); see also Keating v. Sec'y of Health & Human

---

[6]  In applying the five-step sequential analysis, the ALJ is required to determine: (1) whether the claimant is presently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from performing past relevant work; and (5) whether the impairment prevents the claimant from doing any other work. See 20 C.F.R. § 404.1520 (2000).

Servs., 848 F.2d 271, 276 (1st Cir. 1988) (per curiam).  The Commissioner must show that the claimant's limitations do not prevent her from engaging in substantial gainful work, but need not show that the claimant could actually find a job.  See Keating, 848 F.2d at 276 ("The standard is not employability, but capacity to do the job.").

In this case, the ALJ concluded at step four of the sequential evaluation process that Ranfos' impairment prevents her from performing her past work as a restaurant owner, manager, waitress, cook, dishwasher and cashier.  Tr. at 35.  The ALJ determined that Ranfos lacks the RFC "to lift and carry more than ten pounds, sit for prolonged periods without the option to stand as needed for comfort, climb stairs or ladders, or work at unprotected heights."  Tr. at 35.  Given these restrictions, the ALJ concluded Ranfos could not perform her past relevant work.

The ALJ next concluded that Ranfos' impairments do not preclude her from doing other work.  After considering the testimony of the VE, as well as Ranfos' age, educational background, and work experience, the ALJ found, "Although the claimant is unable to perform the full range of sedentary work, she is capable of making an adjustment to work which exists in

-17-

significant numbers in the national economy."  The ALJ then listed the types of jobs Ranfos could perform, which were the same jobs suggested by the VE.

Ranfos argues that the ALJ's decision was tainted by a number of legal errors.  First, Ranfos argues that the ALJ improperly calculated her RFC by ignoring a treating source's opinion concerning her capacity to work.  Second, Ranfos argues that the ALJ failed to assess properly her pain complaints.  Finally, Ranfos asserts that the ALJ failed to carry the Commissioner's burden at step five of the evaluation process, and used an improper hypothetical.  I address each of these arguments in turn.

## A.    The ALJ's Consideration of Ranfos' Treating Source

Ranfos contends that the ALJ did not consider all relevant evidence when determining her RFC.  Specifically, Ranfos complains that the ALJ neglected to consider fully the RFC form completed by Dr. Dainesi, her pain specialist.  In this form, Dr. Dainesi noted that Ranfos had less than a full sedentary work capacity, because "her ability to sit and perform any function is limited by the level of pain she is experiencing."  Tr. at 307.  He also noted that her ability to concentrate would be impaired

-18-

at times due to her pain.  Tr. at 310.  Ranfos' claim that the ALJ failed to consider Dr. Dainesi's observations lacks merit.

First, the ALJ's findings are largely consistent with Dr. Dainesi's observations.  Like Dr. Dainesi, the ALJ found that Ranfos had a less than full sedentary work capacity.  Tr. at 35. The ALJ also found that Ranfos could not "sit for prolonged periods without the option to stand as needed for comfort."  Tr. at 35.  This finding comports with Dr. Dainesi's observation that Ranfos' ability to sit and function would be limited by her pain.

The ALJ did not adopt Dr. Dainesi's opinion that Ranfos' ability to concentrate would be limited by changes in her level of pain.  This detail is important, as Ranfos argues, because the VE testified that if Ranfos had difficulty concentrating, she would be unable to work.  However, the record supports the ALJ's decision not to credit Dr. Dainesi's opinion in this respect.

Ranfos had seen at least five doctors other than Dr. Dainesi, and none opined that she might have problems with her ability to concentrate.  For example, Dr. Kleeman, an orthopedic specialist, saw much improvement in Ranfos after aggressive physical therapy, and advised that she return to work.  Tr. at 282.  Dr. Kilgus, who examined Ranfos for the state disability

-19-

determination service, opined that she had full-time work capacity, although she should preferably perform sedentary work. Tr. at 294. Dr. Kennedy, a chronic pain specialist, examined Ranfos and made many observations regarding her condition. While Dr. Kennedy found that Ranfos suffered from pain and discomfort in her left leg and back, he made no mention of the pain interfering with her ability to concentrate. Tr. at 224. Finally, Ranfos herself, in the testimony she gave at her hearing, discussed her pain, as well as the medication she took and its side effects, but made no mention of a problem with her ability to concentrate.[7]

Dr. Dainesi's statement regarding Ranfos' ability to concentrate being affected by her pain was the only statement made to this effect. Drs. Kleeman, Kilgus and Nault opined that Ranfos had the ability to perform sedentary work, and Dr. Kleeman specifically advised that it would be good for her to do so. Therefore, the ALJ's decision not to credit Dr. Dainesi's opinion

---

[7] Ranfos did refer to a problem with her memory, stating that "I lose my memory lately...I think it's the drugs." Tr. at 60. The record does not reflect that Ranfos ever complained to a doctor about this problem, and no medical evidence supports this statement. Furthermore, a subjective problem with memory is not equivalent to a problem with concentration.

that Ranfos lacked the capacity to concentrate is supported by the record.

## B. The ALJ's Decision Not to Credit Fully Ranfos' Subjective Complaints of Pain

Ranfos argues that the ALJ did not properly analyze the factors outlined in Avery v. Secretary of Health and Human Services, 797 F.2d 19, 29-30 (1st Cir. 1986), before she determined that Ranfos' pain complaints were not fully credible. Specifically, Ranfos alleges that the ALJ erred in relying more heavily upon the opinions of Drs. Kilgus and Kleeman than that of Dr. Dainesi, who was a pain specialist.[8] Ranfos also complains that the ALJ improperly minimized or discounted her allegations of pain made at the hearing, relying instead upon Ranfos' efforts to obtain a job, and a pain questionnaire Ranfos completed in conjunction with her application for benefits.

### 1. Standards Governing an ALJ's Credibility Determination

The SSA regulations require that the ALJ consider a claimant's symptoms, including complaints of pain, when she is

_____

[8] The only aspect of Dr. Dainesi's opinions that is inconsistent with the ALJ's findings is his statement that Ranfos' pain would affect her ability to concentrate. This subject was discussed above. See supra pp. 18-21.

determining whether a claimant is disabled.  See 20 C.F.R. §

404.1529(a).[9]  The ALJ must evaluate the intensity, persistence,

and functionally limiting effects of the claimant's symptoms so

that the ALJ can determine how the claimant's symptoms limit his

or her capacity for work.  See id. § 404.1529(c)(1); SSR 96-7p,

1996 WL 374186, at *1 (1996).  The ALJ must consider all of the

available evidence, including the claimant's medical history, the

medical signs and laboratory findings, the claimant's prior work

record, and statements from the claimant, the claimant's treating

or examining physician or psychologist, or other persons about

how the claimant's symptoms affect her.  20 C.F.R. §

404.1529(c)(1)-(3).

---

[9]  An ALJ must apply a two-step analysis to evaluate a claimant's subjective complaints.  First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that can reasonably be expected to produce pain or other symptoms alleged.  See 20 C.F.R. § 404.1529(b); Da Rosa v. Sec'y of Health and Human Servs., 803 F.2d 24, 25 (1st Cir. 1986) (per curiam).  Then, if such an impairment exists, the ALJ must evaluate the intensity and persistence of the claimant's symptoms.  See 20 C.F.R. § 404.1529(c).  The ALJ made a specific finding regarding the first step of the analysis, determining that "the evidence supports a finding that Ms. Ranfos has a soft tissue injury to her left lower extremity and degenerative disc disease of the lumbar spine, impairments which cause significant vocationally relevant limitations."  Tr. at 28.  Ranfos does not take issue with this determination.  Therefore, I focus on the second step of the analysis.

The Commissioner recognizes that symptoms may suggest a more severe impairment "than can be shown by objective medical evidence alone." Id. § 404.1529(c)(3). Accordingly, the ALJ must evaluate the claimant's complaints in light of the following factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate his symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of his symptoms; (6) any measures the claimant uses or has used to relieve symptoms; and (7) other factors concerning the claimant's limitations and restrictions due to pain or other symptoms. Id. § 404.1529(c)(3)(i)-(vii); see also Avery, 797 F.2d at 29-30. These factors are sometimes called the "Avery factors." In addition to considering these factors, the ALJ is entitled to observe the claimant, evaluate her demeanor, and consider how the claimant's testimony fits with the rest of the evidence. See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (per curiam).

In assessing the credibility of a claimant's subjective complaints, the ALJ must consider whether these complaints are consistent with the objective medical evidence and other evidence in the record.  See 20 C.F.R. § 404.1529(a).  While a claimant's complaints of pain must be consistent with the medical evidence to be credited, they need not be precisely corroborated with such evidence.  See Dupuis v. Sec'y of Health & Human Servs., 869 F.2d 622, 623 (1st Cir. 1989) (per curiam).  When making a credibility determination, the ALJ must also make specific findings as to the relevant evidence she considered in deciding whether to believe a claimant's subjective complaints.  Da Rosa, 803 F.2d at 26.

2.   The ALJ's Assessment of Ranfos' Subjective Allegations

The ALJ's analysis of Ranfos' subjective allegations of pain is supported by substantial evidence in the record.  Ranfos complained at her hearing that she suffers from a great deal of pain, needs to change positions frequently, and likes to lean against a wall to support herself when standing.  Tr. at 51, 58. The ALJ found Ranfos' statements credible to a large extent.  Tr. at 35.  For instance, she found that, as a result of her pain, Ranfos could not "lift and carry more than ten pounds," or "sit

for prolonged periods without the option to stand as needed for comfort." Tr. at 35. Furthermore, based in part upon the testimony given by Ranfos at the hearing, the ALJ found Ranfos to have a more limited RFC than was suggested in the opinions of the non-examining physicians. Tr. at 32. Thus, the ALJ largely credited Ranfos' subjective allegations of pain.

Indeed, the ALJ rejected only Ranfos' claim that she needed to lean against a wall for support. To support her conclusion on this issue, the ALJ relied upon medical evidence and other statements made by Ranfos. Tr. at 30. The ALJ wrote, "There is no question that the claimant has significant restrictions, yet preclusion of substantial gainful activity in a full-time position is not supported by medical reports or the claimant's written and oral reports." Tr. at 30. Statements made by Ranfos that pain from prolonged sitting was relieved by standing, and vice versa, as well as reports that treatments and medications were helping to relieve her pain, caused the ALJ to reject Ranfos' argument that she needed to lean against a wall to relieve pain.

In sum, the ALJ considered, accepted, and accommodated nearly all of Ranfos' subjective allegations of pain. Avery

-25-

requires that an ALJ consider a complainant's subjective testimony; it does not require that an ALJ rely upon subjective testimony where it conflicts with medical evidence. See 797 F.2d at 21. Because Ranfos' allegation regarding her need to support herself against a wall conflicts with the medical evidence, the ALJ did not err when she refused to credit it.

C. **The ALJ's Burden at Step 5 of the Evaluation Process**

Ranfos argues that the ALJ did not meet her burden of demonstrating that Ranfos can perform other work. Ranfos bases her argument on the fact that the hypothetical presented by the ALJ to the VE was inadequate because it did not include all of Ranfos' subjective allegations about her own limitations. As I noted above, the ALJ properly evaluated Ranfos' subjective complaints. Therefore, the ALJ presented a proper hypothetical to the VE, and Ranfos' argument to the contrary lacks merit.

Finally, Ranfos argues that the ALJ erred in relying upon the VE's testimony because some of the jobs that the VE suggested Ranfos could perform are classified by the Dictionary of Occupational Titles ("DOT") as light rather than sedentary. This argument also fails. Some of the positions classified by the DOT

as light do not involve duties that exceed those put forth in the hypothetical.  One of the jobs identified by Ranfos as light rather than sedentary, an assembly worker, actually contains several variations, with the DOT classifying some assembly positions as sedentary.  DOT 713.687-018, 732.684-062, 739.687-066.  Moreover, the DOT classifications represent the maximum requirements for a position, rather than a range.  Hall v. Chater, 109 F.3d 1255, 1259 (8th Cir. 1997) (citing Jones v. Chater, 72 F.3d 81, 82 (8th Cir. 1995)).  The ALJ thus was not bound by the DOT classifications, and properly found that there are a significant number of jobs in the local and national economy that Ranfos can perform.

## IV.  CONCLUSION

Because I have determined that the ALJ's denial of Ranfos' application for benefits is supported by substantial evidence, I affirm the Commissioner's decision.  Accordingly, Ranfos' motion to reverse (Doc. No. 6) is denied, and defendant's motion for an order affirming the Decision of the Commissioner (Doc. No. 10) is granted.  The Clerk shall enter judgment accordingly and close

the case.

     SO ORDERED.


                                 _____
                                 Paul Barbadoro
                                 Chief Judge

January 24, 2002

cc:   Raymond J. Kelly, Esq.
       David L. Broderick, Esq.